# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | |
|---|---|
| **KENNETH WILSON, as Parent and Natural Guardian of J.W., a minor child,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:17-CV-3059-DCN** |
| **UNITED HEALTHCARE INSURANCE COMPANY,** | |
| **Defendant.** | |

---

## DEFENDANT UNITED HEALTHCARE INSURANCE COMPANY'S BRIEF IN SUPPORT OF JUDGMENT ON THE SETTLED ADMINISTRATIVE RECORD AND PLAN DOCUMENT

Pursuant to the Court's Specialized Case Management Order, as amended, Defendant United HealthCare Insurance Company (hereinafter "UHIC"), submits this Brief in Support of Judgment on the Settled Administrative Record and Plan Document.

## INTRODUCTION

Plaintiff Kenneth Wilson filed this action to contest the denial of claims for a two-year residential treatment facility admission for his 14 year-old son, J.W.'s, mental health problems at Change Academy at Lake of the Ozarks ("Change Academy"), an out-of-network facility providing 24-hour monitoring, academics, and mental health treatment. J.W. was covered as a dependent under the Towers

1638897.3

Research Capital, LLC Welfare Benefit Plan (the "Towers Research Plan" or "Plan") during this admission.  UHIC became the Plan's insurer four months into J.W.'s stay at Change Academy.  UHIC began receiving claims for dates of service beginning December 1, 2015, which it denied because it determined treatment for J. W. at the residential treatment level of care was not medically necessary under the terms of the applicable ERISA plan.  His condition did not require that intense a level of care, and he could have been treated safely and effectively at a lower level of care.[1]

---

[1] This case involves what is commonly referred to as a "level of care" denial. Such cases call into question whether the patient's condition required services of such an intensity that they could only be provided in that setting.  The various settings for mental health services, from the highest intensity to the lowest intensity are:  (1) Inpatient, (2) Residential Treatment, (3) Partial Hospitalization, (4) Intensive Outpatient, and (5) Outpatient.  Inpatient and Residential Treatment are settings in which the patient resides 24 hours per day.  The others are various intensities of outpatient services.  *See generally* Level of Care Guidelines: Mental Health Conditions.  (AR 495-511).

Residential treatment is a sub-acute facility-based program that delivers 24-hours/7-day assessment and diagnostic services and active behavioral health treatment to members who do not require the intensity of nursing care, medical monitoring, and physician availability offered in an inpatient setting.  (AR 484).

The medical necessity requirements of the Towers Research Plan require that covered care be provided in the least costly setting likely to produce an equivalent therapeutic result from treatment.  (AR 265-266).  Whether care is medically necessary is determined in a process called Utilization Review.  Determinations that services are not medically necessary for behavioral health care are made by licensed physicians.  (AR 242).  UHIC uses guidelines and protocols to assist in applying medical necessity principles to claims.  (*Id.*)  (*See generally* AR 196).

2

## STATEMENT OF FACTS

### A.    Coverage History

J.W. was covered as a dependent under the Plan prior to December 1, 2015 through the times relevant in this lawsuit. (AR 1-480, 1380).  Effective December 1, 2015, the Plan changed insurers and benefits thereafter were funded by a group health benefits policy underwritten and issued by UHIC. (AR 2873; 1-480).  J. W.'s stay at Change Academy had been underway several months prior to UHIC becoming the insurer of the Plan.   Change Academy was an out-of-network provider under the Plan.

### B.    Facts Underlying the Claim of Coverage

#### 1.    Prior to December 1, 2015

When J. W. was admitted to Change Academy, he was 14 and had been on medication since the third grade for ADHD and received outpatient counseling for mental health problems. (AR 676, 1430).  He lived with his mother, a nurse, his father, a stock trader, and his 11-year-old sister. (*Id.*)  While living at home, J.W. reported watching pornography, verbally antagonizing others, yelling, swearing, insulting his parents and peers when angry, making verbal threats, destroying property, and becoming physically violent (such as kicking a hole in a wall, beating big sticks against trees, and/or smashing boxes).  (AR 1429-1430).  His

3

medical history was positive for Tourette's syndrome with eye blinking, leg movement, and facial muscle tics, but he was otherwise considered in good physical health. (AR 677, 1430).

J.W. began receiving services at Change Academy commencing on July 29, 2015 and remained there until July 31, 2017. (AR 1404-3916). On admission to Change Academy, J.W.'s chief complaint was "[f]reaking out, my old school could not handle my behavior." (AR 676, 1429). He was then diagnosed with disruptive mood dysregulation disorder, generalized anxiety disorder, attention deficit/hyperactivity disorder, oppositional defiant disorder, and unspecified neurodevelopmental disorder. (AR 676). J.W. reported that he felt sad or mad most of the time, had low self-esteem, feelings of helplessness and hopelessness, and had had suicidal thoughts. (*Id.*) He was easily distracted, and had difficulty concentrating. (*Id.*) He was prescribed medication for these symptoms. (*Id.*)

Shortly after admission to Change Academy, J.W. had a brief acute inpatient stay at Lake Regional Behavioral Health from October 24, 2015 to October 28, 2015 for making threats to kill himself. (AR 676, 1415). With the exception of this episode and occasional behavioral outbursts, as a whole, J.W.'s residency at Change Academy was essentially uneventful (AR 677, 1404-3916).

### 2.    After December 1, 2015, When UHIC Becomes the Insurer.

Effective December 1, 2015, UHIC became the insurer of the Towers Research Plan.  Nursing notes from December 1, 2015 through the end of his stay on July 15, 2017, indicate that while at Change Academy, J.W. did not behave in a manner that posed a serious imminent danger to himself or others.[2]  Attachment 1 summarizes the nurses' notes for his entire two year stay.  As summarized in Attachment 1, nursing notes after December 1, 2015 repeatedly report that J.W. did not display issues with hygiene, nutrition, or sleep, nor did he routinely display serious verbal or physical aggression. (*Id.*)  Additionally, these notes state that J.W. engaged in reciprocal conversations, interacted with peers and staff, and did not routinely require safety physical interventions.  (*Id.*)  Records indicate that by December 1, 2015, J.W. had made progress since his initial admission.  (*Id.*)  In fact, between December 1, 2015 and July 15, 2017, facility notes show that while J.W. displayed verbal or occasionally physical aggression, his behavior rarely required emergency safety physical intervention and was not a threat to himself or others.  (*See* Attachment 1.)  For example, nursing notes on December 8, 2015

---

[2] AR 604-620, 1609-1652, 1664-1687, 1701-1727, 1873-1888, 1958-1975, 2014-2037, 2052-2075, 2110-2137, 2178-2202, 2224-2248, 2272-2297, 2320-2345, 2358-2376, 2388-2422, 2461-2481, 2498-2513, 2543-2558, 2584-2604, 2631-2642, 2668-2692, 2719-2738, 2774-2798, 2829-2853, 2904-2922, 2961-2979, 3004-3006, 3043-3058, 3094-3109, 3145-3166, 3202-3218, 3259-3275, 3325-3346, 3352-3367, 3407-3420, 3446-3459, 3485-3576, 3612-3635, 3669-3690, 3710-3733, 3755-3778, 3800-3828, 3854-3873, 3889-3900.

1638897.3

report that during the afternoon shift, J.W. did not display any issues with food, hygiene, sleep or verbal or physical aggression toward others or himself.  (AR 1620).   Later that same day, additional notes indicate that J.W. continued to interact with peers and staff, engage in reciprocal conversation, and was respectful of peers and staff, but apparently engaged in profanity.  (AR 1621).  No physical intervention was necessary (AR 1620-1621).  For the most part, J.W.'s behaviors are the same each day – some days acting appropriately, other days exhibiting verbal, and on occasion physical, aggression[3].  (*See* Attachment 1.)   Overall, medical records do not indicate that J.W.'s behavior between December 1, 2015 and July 15, 2017 required the intensity of treatment at the residential treatment level of care.

## C.    The Claims

For ease of analysis, we have grouped two years' worth of claims, all submitted after services had been rendered, into three categories. The First Dates of Service ("DOS") consists of claims on which Plaintiff fully exhausted administrative remedies and sought external review.  The Second DOS covers 60 days' worth of claims on which

---

[3] AR 604-620, 1609-1652, 1664-1687, 1701-1727, 1873-1888, 1958-1975, 2014-2037, 2052-2075, 2110-2137, 2178-2202, 2224-2248, 2272-2297, 2320-2345, 2358-2376, 2388-2422, 2461-2481, 2498-2513, 2543-2558, 2584-2604, 2631-2642, 2668-2692, 2719-2738, 2774-2798, 2829-2853, 2904-2922, 2961-2979, 3004-3006, 3043-3058, 3094-3109, 3145-3166, 3202-3218, 3259-3275, 3325-3346, 3352-3367, 3407-3420, 3446-3459, 3485-3576, 3612-3635, 3669-3690, 3710-3733, 3755-3778, 3800-3828, 3854-3873, 3889-3900.

Plaintiff made a qualified request for internal appeal. The Third DOS are all of the claims not included in the First DOS and Second DOS during this two year stay for which no attempt was made to initiate or exhaust administrative appeals.

### 1. December 1, 2015 – May 15, 2016 (the "First DOS").

UHIC initially received claims from Change Academy for services it had provided to J.W. from December 1, 2015 through May 15, 2016. (AR 1585, 1656, 1772, 1816, 1922, 1978, 2040, 2078, 2160), which it denied on the basis that J.W.'s condition did not require treatment at the residential level of care and, therefore, did not meet the Plan's medical necessity requirements. (AR 623-647). In making the initial determination, Dr. Teresa Mayer, a board certified child psychiatrist and Associate Medical Director with United Behavioral Health ("UBH")[4], conducted a review of facility records, electronic clinical records and claim information for services provided between December 1, 2015 and May 15, 2016, and concluded J.W. did not meet the medical necessity level of care guidelines for Mental Health Residential treatment. Dr. Mayer noted that she personally reviewed the record submitted by the facility. She found that by December 1, 2015, J.W. had made progress and could have been safely stepped down into a lower level of care in his home area. (AR 2873). During the

---

[4] United Behavioral Health is an affiliate of UHIC that processes claims and appeals for UHIC involving behavioral health services. (*See e.g.,* AR 38, 97 regarding delegation of claims processing and interpretation of benefits.)

7

timeframe in question, December 1, 2015 through May 15, 2016, she found J.W. had an unremarkable course. There was no evidence of severe behavioral lack of control, frequent need for medication changes, or any requirements for 24-hour monitoring. She noted that the Change Academy program is designed to last one school year and is not tailored specifically to individuals. She did note that his condition would qualify for coverage at the intensive outpatient services level of care. (AR 2873-2874).

An internal appeal was taken of the denial. (AR 648-651). Throughout the appeal process, and external appeal process that followed, no psychiatrist or other health care provider ever offered an opinion in the administrative record on behalf of Plaintiff that the residential level of care was medically necessary for J.W.

UBH referred the appeal to a different medical director, Dr. Ronald Beach, a psychiatrist and Associate Medical Director. (AR 1393-1394). Dr. Beach reviewed all pertinent records from Change Academy, including all aspects of clinical care involved in treatment, and discussed J.W.'s condition personally with J.W.'s psychiatrist. (AR 658-659). When asked to identify the key issues that he felt required coverage of services, the treating psychiatrist, Dr. Mahal, who saw J.W. only once per month, stated that he continued to have episodes of disruptive behavior. Dr. Mahal also stated that even though J.W. had been at the facility for a

8

year by that time, no discharge planning had been undertaken.  (AR 2877-2878).[5]
Dr. Beach concluded that care for his disruptive episodes could have been safely
provided in a day program near J.W.'s home.  (*Id.*) (AR 658-659).  Dr. Beach
determined that J.W.'s condition was not severe enough to require admission to a
residential treatment facility and affirmed the denial.  (*Id.*)  UHIC's appeal
decision explained the rights to further appeals available under the Plan including
external review. (*Id.*)

A request for external review on behalf of J.W. was sent on December 6,
2016, to the State of New York. (AR 652-654).  An external appeal by an
independent review organization was then initiated under New York law on
December 6, 2016. (AR 673-679). The state of New York assigned the external
appeal to MCMC. (*Id.*) The MCMC psychiatrist, who was board  certified in Child
Psychiatry, reviewed clinical and administrative documentation from Change
Academy covering J.W.'s stay from December 1, 2015 through at least November
2016.[6]  (*Id.*) The MCMC psychiatrist agreed with UHIC and upheld the denial on
January 3, 2017, saying that the entire stay from December 1, 2015 forward was

---

[5] Plaintiff never submitted anything from Dr. Mahal in the record arguing that the residential treatment level of care was medically necessary.

[6] While the January 3, 2017 IRO determination does not specify the exact dates covered in the medical documentation provided for review, the MCMC psychiatrist analyzes and discusses specific medical records through at least November 9, 2016.  (AR 677).

1638897.3

not medically necessary.  The MCMC psychiatrist's summarization of the medical

records is telling:

> The patient's stay for the most part was uneventful.
> Nurses' notes repeatedly report that the patient did not
> require safety physical interventions, engaged in
> reciprocal conversations, interacted with peers and staff,
> was respectful to peers and staff, and did not display
> verbal or physical aggression.  He had several minor
> incidents, such as spitting at a peer on one occasion.
> Staff intervention involved forcing the patient to remain
> in a kneeling position.
>
> A nursing note on 12/02/2015 reported that the patient
> did not display issues with his hygiene.  He did not
> display issues around sleep.  He required "*zero
> emergency safety physical interventions.*"  He was
> somewhat isolated from peers and staff and used
> profanity.  There was no physical aggression towards
> others or self.  He reportedly "*did not benefit from
> reparative relational experiences during the shift.*"  Later
> that day, another note reported the patient participated in
> a group, and his affect was appropriate.
>
> The remainder of the patient's stay was essentially
> uneventful, with the exception of isolated incidents of
> acting out behavior and difficulties with peer
> relationships, which one would expect from an unhappy
> 14 year old with ADHD.  On one occasion, the patient
> attempted to "*huff gasoline.*"  On other occasion, some
> superficial scratches were noted on his arms.
>
> There was [never] any evidence of credible serious
> imminent danger to self or others.  On 11/09/2016 during
> a family session, the patient discussed his feelings of
> shame and having been away from home for two years
> and stated the sincere desire to return home.  He wanted

10

to be home by Christmas. His parents and therapists refused to provide him with any timeframe for his transition. The therapist felt the patient "*needs to continue working to improve his communication with his parents and his ability to process difficult topics more openly with his therapist in individual sessions.*"

[All italics in original.]

The MCMC psychiatrist concluded:

[T]he continued residential mental health admission 12/01/2015 - forward was not medically necessary.

…

Nothing in the documentation reviewed indicates that this patient required or could benefit from 24-hour daily confinement, observation, and treatment. On the contrary, a more appropriate treatment plan would have included intensive outpatient treatment with a very strong family therapy component while the patient lived in his community with his family.

(AR 678).

The MCMC reviewer thus agreed with both UBH Medical Directors that the appropriate level of care was the lower intensive outpatient level of care. (AR 678). While appeals of the First DOS were pending, J.W. continued to receive treatment at Change Academy.

11

2.     **July 16-31, August 1-15, and November 1-30, 2016 (the "Second DOS")[7]**

UHIC received additional claims for services from July 16 through July 31, 2016; August 1 through August 15, 2016; and November 1 through November 30, 2016. (AR 1008-1013, 1014-1019, 1080-1085).  After reviewing those claims, UHIC denied them on October 10, 2016 and December 16, 2016, for the same reasons as the others:  lack of medical necessity for the residential treatment level of care. (*Id.*)  On January 26, 2017, Mr. Wilson's attorney sent a letter to UHIC regarding the claims for the Second DOS.  (AR 3919-3920).  While counsel's letter asks that UHIC review the denials, she directed UHIC not to do anything until medical records were submitted, which she stated she was in the process of obtaining.  (*Id.*) She also requested UHIC provide copies of records upon which UHIC based its denials. (*Id.*)   The letter was not accompanied by a HIPAA compliant authorization.  UHIC did not respond to this letter.  Plaintiff's counsel sent a follow-up letter dated February 24, 2017, that included a copy of the first letter, but again failed to include a HIPAA compliant authorization. (AR 3926-3929).  UHIC did not respond to this letter.  Plaintiff's counsel never submitted the promised medical records.

---

[7]  These 60 days of service are grouped together because claim numbers for these dates of services are listed specifically in the subject line of the letters from Plaintiff's counsel purporting to initiate an appeal discussed below.

1638897.3

### 3. The other Dates of Service Through Discharge on July 31, 2017 (the "Third DOS")

UHIC received claims for remaining dates of service[8] during his two year stay through July 31, 2017, the date upon which J.W. was discharged from Change Academy. (AR 720-744, 759-800, 1364-1379). UHIC also denied those claims for lack of medical necessity of the residential treatment level of care. No appeals have been taken of those denials.

## ARGUMENT

### I. UHIC's Denials Must Be Reviewed Under the Arbitrary and Capricious Standard of Review.

The Towers Research Plan provides for the arbitrary and capricious standard of review. (*See* AR 156; 314-315; 476-477). ("The Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority

---

[8] Other dates of service not included in the First and Second DOS for which claims were submitted to UHIC include May 15-31, 2016; June 1-15, 2016; June 16-30, 2016; July 1-15, 2016; August 16-31, 2016; September 1-15, 2016, September 16-2016; October 1-15, 2016; October 16-31,2016; December 1-15, 2016; December 16-31, 2016; January 1-15, 2017; January 16-31, 2017; February 1-15, 2017; February 16-28, 2017; March 1-15, 2017; March 16-31, 2017; April 1-15, 2017; April 16-30, 2017, May 1-15, 2017; May 16-31, 2017; June 1-15, 2017; June 16-30, 2017; July 1-15, 2017; and July 16-31, 2017. (AR 720-744, 759-800, 813-884).

13

shall be given deference and be legally binding on all parties and subject to review by a legal authority only to the extent the decision was arbitrary and capricious.").

This Court, therefore, should review UHIC's denials applying the arbitrary and capricious standard of review. UHIC made the claims and appeal determinations here based on its careful review of the materials it was provided in conjunction with the Plaintiff's claims and its medical necessity criteria. Because the Plan grants UHIC full discretion to determine whether treatment is medically necessary, any such decision must be evaluated under the deferential abuse of discretion standard. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) ("Where the plan provides to the contrary by granting 'the administrator or fiduciary discretionary authority to determine eligibility for benefits,' '[t]rust principles make a deferential standard of review appropriate.'") (internal quotations omitted). This standard requires this Court to affirm a claims decision so long as there is a reasonable basis for that decision. *See also, Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787 (4th Cir. 1995) (applying arbitrary and capricious standard of review based on analogous language) (citations omitted); *Thomas v. Truck Drivers and Helpers Local No. 355, Health and Welfare Fund/Pension Fund*, 771 F. Supp. 714, 715 n.1 (D. Md. 1991) (holding that if the Plan administrator has authority to determine eligibility for benefits, then the

appropriate standard of review is arbitrary and capricious) (citing *Reilly v. Blue Cross & Blue Shield United of Wis.*, 846 F.2d 416, 419 (7th Cir.) (appropriate standard of review is whether the "decision or conduct was arbitrary, capricious or motivated by bad faith"), *cert. denied*, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988)).

## II.    Plan Coverage Requires that All Services Must be Medically Necessary.

All medical services provided under the Plan must meet the medical necessity requirements in order to be covered. Exclusion J of the Certificate of Coverage (the exclusion UHIC relied on to deny the claims) reads:

> In general, We will not cover any health care service, procedure, treatment, test, device or Prescription Drug that We determine is not Medically Necessary. If an External Appeal Agent certified by the State overturns Our denial, however, We will Cover the service, procedure, treatment, test, device or Prescription Drug for which coverage has been denied, to the extent that such service, procedure, treatment, test, device or Prescription Drug is otherwise Covered under the terms of this *Certificate*.

(AR 388) (emphasis in original). The Certificate of Coverage defines the term "medically necessary" as:

> [H]ealth care services provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance-related and addictive disorder, condition, disease or its symptoms, that are all of the following as determined by us or our designee[:]

15

- In accordance with Generally Accepted Standards of Medical Practice.

- Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance-related and addictive disorder, disease or its symptoms.

- Not mainly for your convenience or that of your doctor or other health care provider.

- Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.

(AR 425).

If UHC determines that a provided treatment is not medically necessary, that treatment will not be covered.

## III.    UHIC's Denial of the First DOS Was Not Arbitrary or Capricious, Especially in Light of the External Appeal Decision Affirming the Denials.

### A.    Three different psychiatrists, one of them independent, agreed the care was not medically necessary.

On appeal, Dr. Beach upheld Dr. Mayer's initial denial because the residential level of care J.W. received for his mental health problems was not medically necessary and that treatment could have been provided as an outpatient in his local area. This decision followed a peer-to-peer telephone conversation with

16

J.W.'s psychiatrist and was based on the Level of Care Guidelines for the Mental Health Residential Treatment Services Level of Care.

As allowed by the Towers Research Plan, an external appeal was taken. On January 3, 2017, an independent board certified child psychiatrist for MCMC concluded his or her own review of those dates of service, and determined that the residential treatment provided to J.W. was not medically necessary, that the medical records did not indicate that J.W. could benefit from 24-hour daily confinement, observation, and treatment, and that a more appropriate treatment plan, given his condition, would have included intensive outpatient treatment with a very strong family therapy component while J.W. lived in the community with his family. The MCMC psychiatrist also determined that J.W.'s condition had improved prior to December 1, 2015 when UHIC became the insurer, and that his residual problems were consistent in nature to a person of his age with ADHD.

The independent external review conducted by MCMC is mandated not only by New York law but also by the Patient Protection and Accountable Care Act ("PPACA"), 42 U.S. Code § 300gg-19(b). An external reviewer's decision to uphold an administrative denial is extremely relevant to whether the denial was arbitrary and capricious. Where a plan administrator's decision is reviewed and upheld by an IRO, the Plan Administrator's decision is presumptively reasonable.

*Tansey v. Anthem Health Plans,* 619 F. App'x 24 (2nd Cir. 2015) ( affirming benefit denial as not arbitrary and capricious in light of, among other things, affirmance by IRO reviewer); *Amy G. v. United HealthCare* (Case No: 2:170cv-99427 BSS) 2018 WL 2303156 (D. Utah May 21, 2018) (denial of coverage for residential treatment of mental conditions not arbitrary or capricious where IRO reviewer affirmed denials); *Sanders v. Batelle Energy Alliance, LLC* (CV 1:14-cv-00457-EJL-REB) 2016 WL 5334679 D. Idaho August 18, 2016 (same); *see also, Univ. Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 847 (6th Cir. 2000) (upholding decision by plan administrator supported by independent review organizations' determination); *Douglas v. Gen. Dynamics Long Term Disability Plan*, 43 F. App'x 864, 869 (6th Cir. 2002) (upholding plan administrator's decision when supported by independent medical evaluators); *Estate of Larrimer v. Med. Met. of Ohio*, No. 2:06-cv-920, 2009 WL 1473981, S.D. Ohio May 27, 2009).  Here the denial of the First DOS claims by the external reviewer, an independent child psychiatrist, dictates that UBH's decisions were reasonable.

> **B.    Because UBH acted reasonably in reviewing the First DOS, it did not abuse its discretion in denying the claims initially or on appeal under *Booth*.**

The abuse of discretion standard "equates to reasonableness." *Evans v. Eaton Corp. Long Term Disability Plan,* 514 F.3d 315, 322 (4th Cir. 2008).  A

court, therefore, cannot set aside a benefits decision "as long as it was a reasonable exercise of discretion, was the result of a deliberate, principled reasoning process, and based on substantial evidence." *Millage v. B.V. Hedrick Gravel & Sand Co. Emp. Benefit Plan*, No. 3:10-cv-140, 2011 WL 4595999 (W.D.N.C. Sept. 30, 2011) (citing *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir. 1999)). If the administrator's decision satisfies this test, it must be upheld even if the Court would have "come to a different conclusion independently." *Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 85 (4th Cir. 1993), *abrogated on other grounds by Carden v. Aetna Life Ins. Co.*, 559 F.3d 256 (4th Cir. 2009). A court, indeed, cannot "forget its duty of deference and its secondary rather than primary role in determining a claimant's right to benefits." *Evans*, 514 F.3d at 323 (internal citations and quotations omitted).

In determining the reasonableness of a fiduciary's discretionary decision, a court may consider the following nonexclusive factors:

> (1)  the language of the plan;
>
> (2)  the purposes and goals of the plan;
>
> (3)  the adequacy of the materials considered to make the decision and the degree to which they support it;
>
> (4)  whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan;

19

1638897.3

(5)  whether the decision-making process was reasoned and principled;

(6)  whether the decision was consistent with the procedural and substantive requirements of ERISA;

(7)  any external standard relevant to the exercise of discretion; and

(8)  the fiduciary's motives and any conflict of interest it might have.

*Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000). The plaintiff in an ERISA case bears the burden of establishing that a fiduciary abused its discretion in denying a benefits claim. *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 270–73 (4th Cir. 2002).

UBH's decision to deny the First DOS was reasonable and proper. Two board certified psychiatrists reviewed J.W.'s medical records (the latter after talking with J.W.'s attending physician). Importantly, Plaintiff never submitted any opinion in the record from any behavioral health provider arguing that the residential treatment met the medical necessity requirements. Both psychiatrists concluded that J.W.'s condition did not warrant treatment at the residential treatment level of care for his mental condition. A third psychiatrist with an independent review organization later affirmed this result. Hence UBH acted reasonably, and the following *Booth* factors support this conclusion.

20

1.    **The first *Booth* factor—the language of the Plan—weighs in UBH's favor.**

As discussed above, the Plan provides UBH the "full discretionary authority to administer and interpret" the Plan.  The Plan only covers "eligible expenses." (AR 263).[9] UBH determines whether a given expense is an eligible one using the medical necessity coverage guidelines it has developed. (AR 481-525).  UBH must determine that the treatment is medically necessary, based on the UBH coverage criteria guidelines. (AR 242, 266).

Here, UBH applied the Level of Care Guidelines for residential treatment. (AR 481-517).  UBH exercised the discretion delegated to it by applying the Guidelines to the claims. These actions are in harmony with the unambiguous language of the Plan.  Apart from any guidelines, common sense dictates that the infrequency of aggressive outbursts did not require the Residential Treatment level of care to manage.  The first *Booth* factor thus weighs in favor of UBH.

2.    **The third *Booth* factor—the adequacy of the materials considered by UBH, and the degree to which they support its decision—weighs heavily in favor of UBH.**

In both decisions made by its psychiatrists, UBH had before it all the materials then available to evaluate the claim.  Dr. Mayer and Dr. Beach reviewed

---

[9] These citations are to the 2016 Certificate of Coverage.  The 2015 and 2017 Certificates contain identical language.

J.W.'s detailed treatment history at other facilities; his prior assessments, symptoms, behaviors, and progress in treatment; his "biopsychosocial situation," including his home environment, family involvement, and family history; his previous treatment plans and complicating factors; and the drugs prescribed to J.W. Dr. Beach also spoke directly to J.W.'s psychiatrist, Dr. Mahal, prior to making his decision. The instances of conduct needing treatment were so sporadic that 24 hour care and monitoring was not warranted. Indeed, the medical records indicate that J.W. exhibited no inclinations toward self-injury at all during his entire stay after December 1, 2015.

Because none of the information presented to either psychiatrist suggests that J.W.'s condition met the criteria for residential treatment, UBH did not abuse its discretion in deciding that the residential level of care provided to J.W. at Change Academy lacked medical necessity.

### 3.      The Fifth *Booth* Factor – whether the decision making process was reasoned and principled – weighs heavily in UBH's favor.

UBH's decision-making process was both reasoned and principled. Dr. Mayer and Dr. Beach reviewed and applied their medical judgment after reviewing J.W.'s relevant medical history, treatment record, and other relevant facts. Both concluded that J.W.'s condition could have been treated at the lower intensive

outpatient level of care.  The external review psychiatrist with MCMC agreed, and reached the same conclusion.

In short, the multiple levels of informed review show that UBH employed a principled and well-reasoned decision-making process.  *Cf. Machovec v. Prudential Ins. Co. of Am.*, No. 03-cv-1920, 2004 L 1505523, at *5 (D. Md. June 28, 2004) (holding claims administrator engaged in reasoned and principled decision-making process where "claim was reviewed by three claims managers and two clinicians at three different stages, all of whom agreed to deny the claim.").

### 4. The sixth *Booth* factor – compliance with ERISA's procedural and substantive requirements – weighs heavily in favor of UBH.

The Plan informed its members about their rights under ERISA, including their right to information about benefits determinations and right to file suit in federal court after exhausting any internal appeals.  (AR 312-313).  More importantly, UBH processed the initial review and then notified all concerned of its decisions, well within the timeframe required by the Plan and ERISA.  Dr. Mayer's and Dr. Beach's decision letters contained references to and information about how to appeal the adverse decision.  (AR 623-627; 658-672).  Because UBH complied with ERISA's procedural and substantive requirements, the *Booth* factor weighs heavily in its favor.

5.    **The seventh *Booth* factor – the existence of any external standard relevant to the exercise of discretion – weighs in favor of UBH.**

The Patient Protection and Accountable Care Act (PPACA), 42 U.S.C. § 300gg-19(b) (2013), requires federally regulated plan sponsors to make available a post-appeal review by an independent review organization of benefit denials.  New York state law contained a similar requirement.  Where a plan administrator's decision is reviewed and upheld by an IRO, the plan administrator's decision is presumptively reasonable.  *See, supra,* p. 17-18 and cases cited therein.

Here, a child psychiatrist for MCMC Solutions, an independent review organization, reviewed UBH's denial of coverage, and concluded:

> Nothing in the documentation reviewed indicates that this patient <u>required</u> or could benefit from 24-hour daily confinement, observation, and treatment.  On the contrary, a more appropriate treatment plan would have included <u>intensive outpatient treatment</u> with a very strong family therapy component while the patient lived in his community with his family.

(AR 678). (emphases added).

Because MCMC's independent review confirmed UBH's initial review and decision on appeal, the Seventh *Booth* factor weighs heavily in UBH's favor.

6.    **The eighth *Booth* factor – the fiduciary's motives and any conflict of interest it may have – weighs in UBH's favor.**

A potential structural conflict of interest exists because the Plan is insured,

24

but MCMC's independent review of the claim mitigates the effect of any conflict. MCMC's review provided an extra level of procedural protection against a conflict of interest. But more important than that, MCMC reached the same result as UBH, meaning that, even if the Plan's structure created a conflict of interest, "that conflict may be deemed of such little importance as to recede "to the vanishing point." *Lance v. Ret. Plan of Int'l Paper Co.*, 331 F. App'x, 251, 255 (quoting *Glenn*, 554 U.S. at 117). The eighth *Booth* factor therefore favors UBH heavily.

## IV.    Plaintiff Has Not Exhausted Administrative Remedies as to the Second and Third DOS.

According to the Fourth Circuit, "[a]n ERISA welfare benefit plan participant must both pursue and exhaust plan remedies before gaining access to the federal courts." *Gayle v. United Parcel Serv., Inc.*, 401 F.3d 222, 226 (4th Cir. 2005). "The exhaustion requirement rests upon the Act's text and structure as well as the strong federal interest encouraging private resolution of ERISA disputes." *Makar v. Health Care Corp. of Mid-Atl. (CareFirst)*, 872 F.2d 80, 82 (4th Cir. 1989). "Likewise, '[f]ailure to file a request for review within [a plan's] limitations period is one means by which a claimant may fail to exhaust her administrative remedies.'" *Gayle*, 401 F.3d at 226 ("internal appeal limitations periods in ERISA plans are to be followed just as ordinary statutes of limitations") (quotations omitted).

The Plan provides for internal appeals:

You have up to 180 calendar days after You receive notice of the adverse determination to file an Appeal. We will acknowledge Your request for an internal Appeal within 15 calendar days of receipt. This acknowledgment will include the name, address, and phone number of the person handling Your Appeal and, if necessary, inform You of any additional information needed before a decision can be made.

…

If You disagree with the first level Appeal determination, You or Your designee can file a second level Appeal. You or Your designee can also file an external appeal. The four (4) month timeframe for filing an external appeal begins on receipt of the final adverse determination on the first level of Appeal. By choosing to file a second level Appeal, the time may expire for You to file an external appeal.

A second level Appeal must be filed within 45 days of receipt of the final adverse determination on the first level Appeal.

(AR 407).

Here, the January 26 and February 24, 2017 letters did not operate as an appeal to the 60 days of treatment in the Second DOS. The January 26, 2017 letter purported to direct UHIC to commence an appeal but not to complete it until the Plaintiff submitted to UHIC all of the medical records from the provider. The record discloses that Plaintiff's counsel never submitted any medical records.

Given that Plaintiff's counsel never sent the promised medical records, it is unclear what the letters were. At best, it was a notice of intent to appeal once she

26

obtained the records she needed.  A notice of an intent to appeal is not an appeal. *See Warner v. Liberty Life Assurance Co.*, 336 F.App'x. 676, 677-78 (9th Cir. 2009) (A notice of intent to appeal found not to be an ERISA appeal.)  An appeal would not be commenced with less than all the records in hand.  That would be unreasonable and inefficient.  At worst, counsel's letters were a placeholder and an attempt to dictate how an appeal was to be performed and to manipulate the time table for such an appeal.  Lawyers for ERISA participants do not dictate how appeals are performed and when.  Federal regulations establish timelines for completing appeals.[10]  Either way, it was appropriate for UHIC not to initiate an appeal based on Plaintiff's letters before all the documents were in hand, especially in view of the fact Plaintiff's counsel never submitted the promised medical records.

Plaintiff never submitted appeals for any other dates of service.

**V.    Alternatively, UHIC Properly Denied Claims For Which Plaintiff Failed to Exhaust Administrative Remedies.**

If the Court excuses Plaintiff from exhausting its administrative remedies for the Second and Third DOS, the UHIC's denials were still not arbitrary or capricious because the Administrative Record reasonably demonstrates that J.W.'s

---

[10] Post-service ERISA plan appeals must be completed within 60 days of a request for review.  29 C.F.R. § 2560.603-1(i)(2)(iii)(A).

condition was unchanged since December 1, 2015, when UHIC became the insurer. Nursing notes provided by Change Academy covering treatment between October 1, 2015 and July 15, 2017, repeatedly report that J.W. did not display issues with hygiene, nutrition, or sleep, nor did he routinely display serious verbal or physical aggression, engaged in reciprocal conversations, interacted with peers and staff, and did not routinely require safety physical interventions. (See Attachment 1.) With the exception of isolated incidents of acting out behavior and difficulties with peer relationships, the remainder of J.W.'s stay at Change Academy was uneventful. (AR 677.) The MCMC reviewer reviewed the care up through at least November 2016 and found that residential treatment through that date was not medically necessary. According to the medical records, J.W. improved or at least maintained his status after November 2016. While it certainly would have been appropriate for intensive outpatient therapy of J.W.'s episodes of conduct, 24-hour residential treatment was not medically necessary.

## CONCLUSION

Two UBH psychiatrists reviewed the admission from December 1, 2015 to May 15, 2015 forward and found that residential treatment was not medically necessary. An independent child psychiatrist, with no connection to UHIC or UHB, agreed and affirmed the denial. Plaintiff never submitted an opinion from

28

any health care provider disputing those determinations in the record. For the reasons stated herein and based on the administrative record, the claims denials for the First DOS are due to be upheld. The Court should dismiss the Second and Third DOS for failure to exhaust. Alternatively, the Court should affirm the denials of claims for the Second and Third DOS because they were reasonable, and not arbitrary and capricious.

Respectfully submitted on this the 18th day of June, 2019.

*/s/ Robert L. Brown*
Robert L. Brown
WILSON, JONES, CARTER & BAXLEY, P.A.
3600 Forest Drive, Suite 204
Columbia, SC 29204
Phone: (803) 509-8071
Email: rlbrown@wjlaw.net
*Attorney for United HealthCare Insurance Company*

1638897.3

## Certificate of Service

I hereby certify that on June 18th, 2019, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

M. Leila Louzri
Foster Law Firm, LLC
P. O. Box 2123
Greenville, SC 29601

                          *s/Robert  Brown*
                          Of Counsel