## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

KENNETH WILSON, *as Parent and*  )
*Natural Guardian of J.W., a minor child*,  )
)
          Plaintiff,  )
)  No. 2:17-cv-03059-DCN
          vs.  )
)  **ORDER**
UNITED HEALTHCARE INSURANCE  )
COMPANY,  )
)
          Defendant.  )
_____)

This is an action seeking dependent health insurance benefits pursuant to the

Employee Retirement Income Security Act ("ERISA" or the "Act"), 29 U.S.C.

§ 1132(a)(1)(B), as well as attorney's fees and costs pursuant to ERISA, 29 U.S.C. §

1132(g). The following matter is before the court is on defendant United HealthCare

Insurance Company ("UHIC") memorandum in support of judgment, ECF No. 31,

plaintiff Kenneth Wilson's ("Wilson") memorandum in support of judgment, ECF No.

32, and the parties' joint stipulation, ECF No. 33, and is based on an administrative

record, ECF No. 35. For the reasons set forth below, the court finds that UHIC did not

abuse its discretion and grants judgment in the favor of UHIC.

## I.  BACKGROUND

J.W. is a beneficiary of Tower Research Capital LLC Benefits Plan ("Plan")

based upon Wilson's participation in the Plan as an employee of Tower Research Capital

LLC. ECF No. 35-3 ("2015 Plan"); ECF No. 35-4 ("2016 Plan"); ECF No. 35-5 ("2017

1

Plan").[1]  UHIC denied coverage for J.W.'s inpatient treatment at CALO from December 1, 2015 through July 31, 2017 because it was not "medically necessary," as defined by the Plan.  ECF No. 33 at 3.

### A.     Relevant Plan Terms

The following are terms defined by the Plan used by UHIC to determine if benefit coverage is available[2]:

### 17. Mental Health Care Services

**1.     Inpatient Services.**  We Cover inpatient mental health care services relating to the diagnosis and treatment of mental, nervous and emotional disorders comparable to other similar Hospital, medical and surgical coverage provided under this Certificate.  Coverage for inpatient services for mental health care is limited to Facilities defined in New York Mental Hygiene Law Section 1.03(10), such as:

- A psychiatric center or inpatient Facility under the jurisdiction of the New York State Office of Mental Health;

- A state or local government run psychiatric inpatient Facility;

- A part of a Hospital providing inpatient mental health care services under an operating certificate issued by the New York State Commissioner of Mental Health;

- A comprehensive psychiatric emergency program or other Facility providing inpatient mental health care that has been issued an operating certificate by the New York State Commissioner of Mental Health;

  and, in other states, to similarly licensed or certified Facilities.

We also Cover inpatient mental health care services relating to the diagnosis and treatment of mental, nervous and emotional disorders received at Facilities that provide residential treatment, including room and board

---

[1]  Because the 2015 Plan, 2016 Plan, and 2017 Plan each have substantially similar language, the court will refer to the 2016 Plan as the Plan unless otherwise stated.

[2]  All capitalized terms not defined within have the prescribed definitions given to them in the Plan.

charges. Coverage for residential treatment services is limited to Facilities defined in New York Mental Hygiene Law Section 1.03(33) and to residential treatment facilities that are part of a comprehensive care center for eating disorders identified pursuant to Article 27-J of the Public Health Law; and, in other states, to Facilities that are licensed or certified to provide the same level of treatment.

ECF No. 35-4 at 55 (emphasis in the original).

**Medically Necessary** - health care services provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance-related and addictive disorder, condition, disease or its symptoms, that are all of the following as determined by us or our designee.

- In accordance with <u>Generally Accepted Standards of Medical Practice</u>.

- Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance-related and addictive disorder, disease or its symptoms.

- Not mainly for your convenience or that of your doctor or other health care provider.

- Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.

<u>Id.</u> at 107-108 (emphasis in the original)

<u>Generally Accepted Standards of Medical Practice</u> are standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes.

If no credible scientific evidence is available, then standards that are based on Physician specialty society recommendations or professional standards of care may be considered. We reserve the right to consult expert opinion in determining whether health care services are Medically Necessary. The decision to apply Physician specialty society recommendations, the choice of expert and the determination of when to use any such expert opinion, shall be made by us.

We develop and maintain clinical policies that describe the <u>Generally Accepted Standards of Medical Practice</u> scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations regarding specific services.

<u>Id.</u> at 108 (emphasis in the original).

**Utilization Review**

We review health services to determine whether the services are or were Medically Necessary or experimental or investigational ("Medically Necessary"). This process is called Utilization Review. Utilization Review includes all review activities, whether they take place prior to the service being performed (prior authorization); when the service is being performed (concurrent); or after the service is performed (retrospective). If You have any questions about the Utilization Review process, please call the number on Your ID card. The toll-free telephone number is available at least 40 hours a week with an after-hours answering machine.

All determinations that services are not Medically Necessary will be made by:

> 1) licensed Physicians; or
>
> 2) licensed, certified, registered or credentialed Health Care Professionals who are in the same profession and same or similar specialty as the Provider who typically manages Your medical condition or disease or provides the health care service under review; or
>
> 3) with respect to substance use disorder treatment, effective on the date of issuance or renewal of this Certificate on or after April 1, 2015, licensed Physicians or licensed, certified, registered or credentialed Health Care Professionals who specialize in behavioral health and have experience in the delivery of substance use disorder courses of treatment.

We do not compensate or provide financial incentives to Our employees or reviewers for determining that services are not Medically Necessary. We have developed guidelines and protocols to assist Us in this process. Specific guidelines and protocols are available for Your review upon request.

<u>Id.</u> at 84 (emphasis in original).

**Concurrent Reviews**

**Non-Urgent Concurrent Reviews**.  Utilization Review decisions for services during the course of care (concurrent reviews) will be made, and notice provided to You (or Your designee) and Your Provider, by telephone and in writing, within one (1) business day of receipt of all necessary information.  If We need additional information, We will request it within one (1) business day.  You or Your Provider will then have 45 calendar days to submit the information.  We will make a determination and provide notice to You (or Your designee) and Your Provider, by telephone and in writing, within one (1) business day of Our receipt of the information or, if We do not receive the information, within one (1) business day of the end of the 45-day period.

Id. at 85 (emphasis in original).

**Retrospective Reviews**

If We have all information necessary to make a determination regarding a retrospective claim, We will make a determination and notify You and Your Provider within 30 calendar days of the receipt of the request.  If We need additional information, We will request it within 30 calendar days. You or Your Provider will then have 45 calendar days to provide the information. We will make a determination and provide notice to You and Your Provider in writing within 15 calendar days of the earlier of Our receipt of the information or the end of the 45-day period.

Once We have all the information to make a decision, Our failure to make a Utilization Review determination within the applicable time frames set forth above will be deemed an adverse determination subject to an internal Appeal.

Id. at 85–86 (emphasis in original).

**Utilization Review Internal Appeals**

You, Your designee, and, in retrospective review cases, Your Provider, may request an internal Appeal of an adverse determination, either by phone or in writing.   You have up to 180 calendar days after You receive notice of the adverse determination to file an Appeal. We will acknowledge Your request for an internal Appeal within 15 calendar days of receipt. This acknowledgment will include the name, address, and phone number of the person handling Your Appeal and, if necessary, inform You of any additional information needed before a decision can be made. A clinical peer reviewer who is a Physician or a Health Care Professional in the same or similar specialty as the Provider who typically manages the disease or

condition at issue and who is not subordinate to the clinical peer reviewer who made the initial adverse determination will perform the Appeal.

Id. at 86 (emphasis in original).

**First Level Appeal**

- **Retrospective Appeal.** If Your Appeal relates to a retrospective claim, We will decide the Appeal within 30 calendar days of receipt of the Appeal request. Written notice of the determination will be provided to You (or Your designee), and where appropriate, Your Provider, within two (2) business days after the determination is made, but no later than 30 calendar days after receipt of the Appeal request.

- **Expedited Appeal.** An Appeal of a review of continued or extended health care services, additional services rendered in the course of continued treatment, home health care services following discharge from an inpatient Hospital admission, services in which a Provider requests an immediate review, or any other urgent matter will be handled on an expedited basis. An expedited Appeal is not available for retrospective reviews. For an expedited Appeal, Your Provider will have reasonable access to the clinical peer reviewer assigned to the Appeal within one (1) business day of receipt of the request for an Appeal. Your Provider and a clinical peer reviewer may exchange information by telephone or fax. An expedited Appeal will be determined within the earlier of 72 hours of receipt of the Appeal or two (2) business days of receipt of the information necessary to conduct the Appeal. If You are not satisfied with the resolution of Your expedited Appeal, You may file a standard internal Appeal or an external appeal.

Id. at 87 (emphasis in original).

**Second Level Appeal**

If You disagree with the first level Appeal determination, You or Your designee can file a second level Appeal. You or Your designee can also file an external appeal. The four (4) month timeframe for filing an external appeal begins on receipt of the final adverse determination on the first level of Appeal. By choosing to file a second level Appeal, the time may expire for You to file an external appeal.

A second level Appeal must be filed within 45 days of receipt of the final adverse determination on the first level Appeal. We will acknowledge Your request for an internal Appeal within 15 calendar days of receipt. This acknowledgment will include the name, address, and phone number of the

person handling Your Appeal and inform You, if necessary, of any additional information needed before a decision can be made.

Id. at 88 (emphasis in original).

### Determine Benefits

We make administrative decisions regarding whether this Benefit plan will pay for any portion of the cost of a health care service you intend to receive or have received. Our decisions are for payment purposes only. We do not make decisions about the kind of care you should or should not receive. You and your providers must make those treatment decisions.

Subject to your appeal rights set forth in Section 7: Questions, Complaints and Appeals, we will do the following:

- Make an initial interpretation of Benefits and the other terms, limitations and exclusions set out in this Certificate, the Schedule of Benefits and any Riders and/or Amendments.

- Make factual determinations relating to Benefits.

We may delegate this authority to other persons or entities that may provide administrative services for this Benefit plan, such as claims processing. The identity of the service providers and the nature of their services may be changed from time to time. In order to receive Benefits, you must cooperate with those service providers.

Id. at 38 (emphasis in original).

### Interpretation of Benefits

Subject to your appeal rights set forth in Section 7: Questions, Complaints and Appeals, we will do the following:

- Make initial interpretation of Benefits under the Policy.

- Make initial interpretation of the other terms, conditions, limitations and exclusions set out in the Policy, including this Certificate, the Schedule of Benefits and any Riders and/or Amendments.

- Make factual determinations related to the Policy and its Benefits.

We may delegate this authority to other persons or entities that provide services in regard to the administration of the Policy.

7

Id. at 96 (emphasis in original).

### How to Appeal a Claim Decision

If you disagree with a pre-service request for Benefits determination or post-service claim determination or a rescission of coverage determination after following the above steps, you can contact us in writing to formally request an appeal.

Your request should include:

- The patient's name and the identification number from the ID card.

- The date(s) of medical service(s).

- The provider's name.

- The reason you believe the claim should be paid.

- Any documentation or other written information to support your request for claim payment. Your first appeal request must be submitted to us within 180 days after you receive the claim denial.

Id. at 140–41 (emphasis in original).

### Enforce Your Rights

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.  Under ERISA, there are steps you can take to enforce the above rights.  For instance, if you request a copy of plan documents or the latest annual report from the plan and do not receive them within 30 days, you may file suit in a Federal court.  In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.  If you have a claim for Benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court.

Id. at 154 (emphasis in original).

**Claims     Fiduciary:** UnitedHealthcare     Insurance     Company ("UnitedHealthcare," refer to your Certificate of Coverage for details on the legal entity that provides your coverage) is your Plan's Claims Fiduciary

> and has been delegated this responsibility by your Plan Sponsor. Your
> Claims Fiduciary has the authority to require eligible individuals to furnish
> it with information necessary for the proper administration of your Plan.

Id. at 156–57 (emphasis in original).

> **Discretionary Authority of Plan Administrator and Other Plan**
> **Fiduciaries:** The Plan Administrator and other Plan fiduciaries shall have
> discretionary authority to interpret the terms of the Plan and to determine
> eligibility for benefits in accordance with the terms of the Plan. Any
> interpretation or determination made pursuant to such discretionary
> authority shall be given deference and be legally binding on all parties and
> subject to review by a legal authority only to the extent the decision was
> arbitrary and capricious.

Id. at 156–57 (emphasis in original).

## B.  Relevant Level of Care Guidelines Terms

The following are terms defined in the Level of Care Guidelines: Mental Health

Conditions, ECF No. 35-10, used by UHIC to determine if benefit coverage is available[3]:

> The Level of Care Guidelines is a set of objective and evidence-based
> behavioral health criteria used by medical necessity plans to standardize
> coverage determinations, promote evidence-based practices, and support
> members' recovery, resiliency, and wellbeing for behavioral health benefit
> plans that are managed by Optum and U.S. Behavioral Health Plan,
> California (doing business as OptumHealth Behavioral Solutions of
> California ("Optum-CA")).
>
> The Level of Care Guidelines is derived from generally accepted standards
> of behavioral health practice. These standards include guidelines and
> consensus statements produced by professional specialty societies, as well
> as guidance from governmental sources such as CMS' National Coverage
> Determinations (NCDs) and Local Coverage Determinations (LCDs). The
> Level of Care Guidelines is also derived from input provided by clinical
> personnel, providers, professional specialty societies, consumers, and
> regulators.

ECF No. 35-10 at 1 (emphasis in original).

---

[3] All capitalized terms not defined within have the prescribed definitions given to them
in the Level of Care Guidelines: Mental Health Conditions.

9

**Common Admission Criteria for All Levels of Care**

- The member is eligible for benefits.

AND

- The member's condition and proposed service(s) are covered by the benefit plan.

AND

- Service(s) are within the scope of the provider's professional training and licensure.

AND

- The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care.
    - o Failure of treatment in a less intensive level of care is **not** a prerequisite for authorizing coverage.

AND

- The member's current condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care. Assessment and/or treatment of the factors leading to admission require the intensity of services provided in the proposed level of care.

AND

- Co-occurring behavioral health and medical conditions can be safely managed.

AND

- Service(s) are the following:
    - o Consistent with generally accepted standards of clinical practice;
    - o Consistent with services backed by credible research soundly demonstrating that the service(s) will have a measurable and beneficial health outcome, and are therefore not considered experimental;
    - o Consistent with Optum's best practice guidelines;
    - o Clinically appropriate for the member's behavioral health conditions based on generally accepted standards of clinical practice and benchmarks.

AND

- There is a reasonable expectation that service(s) will improve the member's presenting problems within a reasonable period of time.
    - o Improvement of the member's condition is indicated by the reduction or control of the signs and symptoms that necessitated treatment in a level of care.
    - o Improvement in this context is measured by weighing the effectiveness of treatment against evidence that the member's signs and symptoms will deteriorate if treatment in the current level of care ends. Improvement must also be understood within

the broader framework of the member's recovery, resiliency, and wellbeing.

Id. at 2 (emphasis in original).

**Residential Treatment Center Admission Criteria**

- See <u>Common Admission Criteria for All Levels of Care</u>

AND
- The member is not in imminent or current risk of harm to self, others, and/or property

AND
- The factors leading to admission cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms, and/or psychosocial and environmental factors. Examples include:
    - Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.
    - Psychosocial and environmental problems that threaten the member's safety or undermines engagement in a less intensive level of care.

Id. at 9 (emphasis in original).

> C.    **Level of Care Guidelines – Residential Treatment Center for Mental Health Conditions**

The following is and the Residential Treatment Center Mental Health Conditions

Level of Care Guidelines, ECF No. 35-7, used by UHIC to determine if benefit coverage

is available:

**<u>Level of Care Guidelines – Residential Treatment Center for Mental Health Conditions</u>**

**The course of treatment in a Residential Treatment Center is focused on addressing the "why now" factors that precipitated admission (e.g., changes in the member's signs and symptoms, psychosocial and environmental factors, or level of functioning) to the point that the member's condition can be safely, efficiently and effectively treated in a less intensive level of care.**

**1. Admission Criteria**
    1.1. (See <u>Common Criteria for All Levels of Care</u>)

<u>AND</u>

1.2.  The member is not in imminent or current risk of harm to self, others, and/or property.

<u>AND</u>

1.3.  The "why now" factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors.  Examples include the following:

1.3.1.   Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.

1.3.2.   Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.

**2.  Continued Service Criteria**

2.1.  (See <u>Common Criteria for All Levels of Care</u>)

<u>AND</u>

2.2.   Treatment is not primarily for the purpose of providing custodial care.  Services are custodial when they are any of the following:

2.2.1.   Non-health-related services, such as assistance in activities of daily living (examples include feeding, dressing, bathing, transferring and ambulating);

2.2.2.   Health-related services provided for the primary purpose of meeting the personal needs of the patient or maintaining a level of function (even if the specific services are considered to be skilled services), as opposed to improving that function to an extent that might allow for a more independent existence;

2.2.3.  Services that do not require continued administration by trained medical personnel in order to be delivered safely and effectively.

ECF No. 35-7 at 1–2 (emphasis in original).

**D.    Medical Treatment and Denial of Claims**

On July 29, 2015, J.W. was admitted to residential treatment at Change Academy at Lake of the Ozarks ("CALO") to address issues with his mood.  ECF No. 35-12 at 5.

On October 24, 2015, J.W. was transferred from CALO and admitted to an inpatient facility at Lake Regional Behavioral Health after making threats to kill himself.  ECF No.

35-28 at 101.  J.W. was released back to CALO on October 28, 2015.  ECF No. 35-17 at 4.  Effective December 1, 2015, UHIC began funding, insuring, and underwriting the Plan.  ECF No. 32 at 3; ECF No. 31 at 4.  CALO submitted claims to UHIC for the services provided to J.W. at CALO from December 1, 2015 through May 15, 2016 ("First DOS").  ECF No. 35-28 at 182, 253, 369, 413, 519, 575, 637; ECF No. 35-29 at 24, 106.

Prior to making a determination on those claims, UHIC[4] requested additional information from CALO related to those claims including the DSM codes, services codes, evaluation and treatment plan, and progress and treatment notes.  Id.  After receiving and reviewing the requested information from CALO, Wilson received a letter from Dr. Teresa V. Mayer ("Dr. Mayer"), informing him that insurance coverage for J.W.'s inpatient treatment at CALO during the First DOS was denied on July 19, 2016 ("UHIC initial denial letter").  ECF No. 35-12 at 98–99.  On July 20, 2016, a revised version of the UHIC initial denial letter was sent to Wilson ("revised UHIC initial denial letter").  Id. at 104–05.  The revised UHIC initial denial letter indicated Dr. Mayer denied the coverage because:

> Your child was admitted for residential treatment of his mood problems. Your child did not need the 24-hour monitoring provided in a residential setting, and care could have been provided at a lower level of care such as partial hospital or intensive outpatient services.
>
> Based on our Level of Care Guideline for the Mental Health Residential Treatment Services Level of Care, it is my determination that no authorization can be provided from 12/01/2015-05/15/2016.

---

[4] Both Dr. Mayer and Dr. Beach are employed by United Behavioral Health ("UBH"). UBH is an affiliate of UHIC that processes claims and appeals for UHIC involving behavioral health services. For the purposes of this order, the court uses UHIC to stand for either UBH or UHIC because the Plan allows for UHIC to delegate to the review of claims and appeals to UBH.  ECF No. 35-4 at 38, 98.

> The decision was based on clinical guidelines.
>
> . . .
>
> Your care could have continued in the intensive outpatient setting with individual psychotherapy, family therapy and medication management. A care advocate is available to discuss treatment options and community supports that are available in your area.
>
> . . .
>
> This is an <u>Initial Adverse Determination</u> and it is considered by New York State law to be a determination of medical necessity.

<u>Id.</u> (emphasis in original). Both the UHIC initial denial letter and revised UHIC initial denial letter included the options available for Wilson to appeal or dispute the determination. <u>Id.</u> at 100–102, 106–110.

On August 2, 2016, CALO, on behalf of Wilson, filed an Expedited Appeal for the denial of insurance coverage for J.W.'s treatment at CALO during the First DOS. ECF No. 35-13. Dr. Ronald Beach ("Dr. Beach"), a psychiatrist and Associate Medical Director, was referred to handle the Expedited Appeal. <u>Id.</u> at 2. Dr. Beach was not involved with the review that led to the UHIC initial denial letter. <u>Id.</u> On August 4, 2016, Dr. Beach sent Wilson a letter that confirmed the denial of insurance coverage for J.W.'s treatment at CALO during the First DOS ("UHIC final denial letter"). ECF No. 35-16. The UHIC final denial letter stated Dr. Beach's conclusion was based a completed review of "all aspect of clinical care involved in this treatment episode," including a telephone call with J.W.'s doctor at CALO. <u>Id.</u> at 2. The UHIC final denial letter informed Wilson that Dr. Beach's conclusion was made for the following reasons:

> The non-coverage determination for Residential level of care will be upheld on 12/01/2015 forward. This is based on UBH Level of Care Guidelines for Residential Treatment of Mental Health Disorders. Your son had been

> at this facility for four months by 12/01/2015.  His behaviors had improved.
> He appeared to be able to continue his care at a day program.  This was
> available in your home area.
> . . .
>
> This is your <u>Final Adverse Determination</u> of your appeal and it is
> considered by New York State law to be a determination of medical
> necessity.

<u>Id.</u> at 2–3 (emphasis in original).  The UHIC final denial letter included the options

available for Wilson to file an external appeal of the determination.  <u>Id.</u> at 4–16.  On

December 6, 2016, CALO, on behalf of Wilson, filed an external appeal for the denial of

insurance coverage for J.W.'s treatment at CALO during the First DOS.  ECF No. 35-14.

The Medical Care Ombudsman Program ("MCOP") performed an independent, external

appeal of the denial of insurance coverage for J.W.'s treatment at CALO during the First

DOS, pursuant to the New York State Public Health Law, Article 49.  ECF No. 35-17 at

1.  The MCOP assigned Dr. Soto, who is board-certified in Psychiatry and Child

Psychiatry, to perform the review.  <u>Id.</u> at 3.  Dr. Soto, and each physician on the MCOP

panel reviewing the claims, signed a Declaration of Interest Form whereby each swore

that there was "no material familial, professional, or financial conflict of interest with"

UHIC, Wilson, or CALO.  <u>Id.</u> at 2.  On January 3, 2016, the majority panel and Dr. Soto

issued a letter upholding UHIC's denial of insurance coverage for J.W.'s treatment at

CALO during the First DOS ("External independent denial letter").  <u>Id.</u>  After reviewing

the clinical and administrative documentation, Dr. Soto's expert opinion about J.W.'s

treatment at CALO in the External independent denial letter was as follows:

> Treatment was primarily behavioral in nature, with little evidence of in-
> depth psychodynamic psychotherapy or appropriately intensive family
> therapy, which this patient needed.

The Patient's stay was for the most part uneventful. Nursing notes repeatedly report that the patient did not require safety physical interventions, engaged in reciprocal conversations, interacted with peers and staff, was respectful to peers and staff, and did not display verbal or physical aggression. He had several minor incidents, such as spitting at a peer on one occasion. Staff intervention involved forcing the patient to remain in a kneeling position.

…

The reminder of the patient's stay was essentially uneventful, with the exception of isolated incidents of acting out behavior, and difficulties with peer relationships, which one would expect from an unhappy 14-year-old with ADHD. On one occasion, the patient attempted to "huff gasoline." On another occasion, some superficial scratches were noted on his arms.

There was [n]ever any evidence of credible serious imminent danger to self of others.

Id. at 5. After reviewing all of J.W.'s medical records, the Plan, and the Level of Care

Guidelines, Dr. Soto provided the following opinion and answers to questions:

**1. Are the medical records and accompanying information sufficient to answer the following questions?**

Yes, the medical records and accompanying information are sufficient.

**2. Is the proposed treatment "medically necessary"?**

No, the continued residential mental health admission 12/1/2015 – forward was not medically necessary.

**3. Did the health plan act reasonably, with sound medical judgment and in the best interest of the patient?**

Yes, the health plan did act reasonably, with sound medical judgment, and in the best interest of the patient.

Nothing in the documentation reviewed indicates that this patient required or could benefit from 24-hour daily confinement, observation, and treatment. On the contrary, a more appropriate treatment plan would have included intensive outpatient treatment with a very strong family therapy component while the patient lived in his community with his family.

Id. at 6.  Throughout the process of appealing UHIC's denial of insurance coverage for

J.W.'s treatment at CALO during the First DOS, J.W. continued his residential treatment

at CALO and Wilson continued submitting claims to UHIC for coverage.  ECF No. 35-

18.  Again, UHIC denied coverage for each claim of J.W.'s treatment at CALO because it

was not medically necessary. ECF Nos. 35-19–35-22.  Each denial of coverage for the

claims included the options available for Wilson to appeal or dispute the determination.

Id.

On January 26, 2017, counsel for Wilson sent a letter to UHIC to that she would

be representing Wilson in an appeal of the denial of insurance coverage for claims from

July 16-31, 2016, August 1-15, and November 1-30, 2016 ("Second DOS"), "as well as

any and all denied claims related to treatment received at [CALO]" ("First Letter to

UHIC").  ECF No. 35-33 at 3.  In the First Letter to UHIC, counsel for Wilson made two

requests to UHIC.  Id. at 3–4.  The first request was that UHIC begin its review of the

denied claims, but not complete the review, until she was able to send all of J.W.'s

medical records to UHIC.  Id.  The second request was that UHIC send counsel "a

complete copy of each and every document upon which you have based your denial of

[J.W.]'s claim.  Such documents include any medical documents, substantive documents,

the plan document, and any internal guidelines or regulations which your company has

used in evaluating my client's claim."  Id. at 4.  UHIC did not respond to the First Letter

to UHIC, and Wilson's counsel did not send UHIC J.W.'s medical records.  ECF No. 32

at 12.  On February 24, 2017, counsel for Wilson sent UHIC a second letter stating that

she would be bringing suit in federal court if UHIC did not provide her with the

documents requested ("Second Letter to UHIC").  ECF No. 35-34.  UHIC did not

respond to the Second Letter to UHIC, and Wilson's counsel did not send UHIC J.W.'s medical records.  ECF No. 32 at 13.

On November 10, 2017, Wilson filed this action, ECF No. 1, and amended his complaint on November 13, 2017, ECF No. 5.  The amended complaint alleges a declaration of entitlement to the health insurance benefits, pursuant to 29 U.S.C. §1132(a)(1)(B), and attorney's fees and costs, pursuant to 29 U.S.C. §1132(g).  ECF No. 5 at 3.  On June 18, 2019, Wilson filed his memorandum in support of judgment, ECF No. 31, and UHIC filed its memorandum in support of judgment, ECF No. 32.  On the same day, the parties filed a joint stipulation regarding the administrative record, the Plan, standard of review, and other matters.  ECF No. 33.  The parties also filed an evidentiary appendix to the joint stipulation, which included the administrative record, the Plan, and other documents related to the decision for coverage.  ECF Nos. 35-1–35-34.  On June 25, 2019, Wilson replied to UHIC's memorandum in support of judgment, ECF No. 37, and UHIC replied to Wilson's memorandum in support of judgment, ECF No. 38.  This motion has been fully briefed and is now ripe for review.

## II.  STANDARD

### A.  Denial of Benefits

A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is reviewed under an abuse of discretion standard when the plan vests an administrator with discretionary authority.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). The abuse of discretion standard is "highly deferential" to the plan administrator.  Cosey v. Prudential Ins. Co. of Am., 735 F.3d 161, 168 (4th Cir. 2013).  When applying this standard, "[t]he court must not disturb the administrator's decision if it is reasonable,

even if the court itself would have reached a different conclusion." Haley v. Paul Revere

Life Ins., 77 F.3d 84, 89 (4th Cir. 1996).  When assessing the reasonableness of the

administrator's decision, the reviewing court may consider non-exclusive factors,

including the following:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008)

(quoting Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335,

342–43 (4th Cir. 2000)).  The court shall find that the plan administrator's decision is

reasonable if the denial of benefits results from "a deliberate, principled reasoning

process" and "is supported by substantial evidence." Williams v. Metro. Life Ins. Co.,

609 F.3d 622, 630 (4th Cir. 2010) (internal citation omitted).  Substantial evidence, which

"consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance," is evidence that "a reasoning mind would accept as sufficient to support

a particular conclusion." Whitley v. Hartford Life & Accident Ins. Co., 262 F. App'x

546, 551 (4th Cir. 2008) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966))

(internal quotation marks omitted).

**B. Attorney's Fees**

ERISA provides that "the court in its discretion may allow a reasonable attorney's fee." 29 U.S.C. § 1132(g). The Fourth Circuit has established a five-factor test to guide the court's discretion in awarding attorney's fees, including:

> (1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of attorney's fees; (3) whether an award of fees against the opposing party would deter other persons acting under similar circumstances; (4) whether the party requesting attorney's fees seeks to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

Quesinberry v. Life Ins. Co. of North America, 987 F.2d 1017, 1029 (4th Cir. 1993).

"This five factor approach is not a rigid test, but rather provides general guidelines for the district court in determining whether to grant a request for attorney's fees." Id.

## III.  DISCUSSION

The court will begin its analysis by reviewing whether Wilson exhausted his administrative remedies before bringing this claim. The parties agree that Wilson exhausted his administrative remedies for the claims filed during the First DOS. ECF No. 33 at 1–2. However, UHIC argues that Wilson failed to exhaust his administrative remedies for the claims of services denied during the Second DOS, and for all other dates of services not covered by the First DOS and Second DOS through J.W.'s discharge on July 31, 2017 ("Third DOS"). ECF No. 32 at 12–13; ECF No. 33 at 4. If the court finds that Wilson did not exhaust his administrative remedies for the Second DOS and the Third DOS, UHIC contends the court should deny coverage for those claims. ECF No. 32 at 26–27.

Wilson makes two arguments that all administrative remedies were exhausted. ECF No. 37 at 1–8. First, Wilson asserts that the UHIC final denial letter proves he did fully exhaust all administrative remedies for the First DOS, the Second DOS, and the Third DOS. Id. at 1–2. Next, Wilson claims that UHIC's failure to respond to either the First Letter to UHIC or the Second Letter to UHIC violates 29 C.F.R. § 2560.503-1(l)(1), which statutorily exhausts Wilson's administrative remedies. Id. at 5–8. Finally, Wilson contends that if the court finds that the UHIC final denial letter does not qualify as exhaustion of all administrative remedies for the Second DOS and the Third DOS, then the court should find that the futility exception applies, and Wilson was not required to exhaust the administrative remedies for the Second DOS and the Third DOS. Id. at 2–5.

"ERISA does not contain an explicit exhaustion provision." Makar v. Health Care Corp. of Mid–Atl. (CareFirst), 872 F.2d 80, 82 (4th Cir. 1989). Nevertheless, "[a]n ERISA welfare benefit plan participant must both pursue and exhaust plan remedies before gaining access to the federal courts." Gayle v. United Parcel Serv., Inc., 401 F.3d 222, 226 (4th Cir. 2005) (holding that exhaustion of plan's remedies is "a prerequisite to an ERISA action for denial of benefits") (citing Makar, 872 F.2d at 82). "This exhaustion requirement rests upon the Act's text and structure as well as the strong federal interest encouraging private resolution of ERISA disputes." Makar, 872 F.2d at 82.

ERISA requires benefit plans covered by the Act to provide internal dispute resolution procedures for participants whose claims for benefits have been denied. Id. at 83 (citing 29 U.S.C. § 1133). Employee benefit plans must also provide "adequate, written notice of the specific reasons for such a denial and must afford participants a reasonable opportunity for a 'full and fair review' of the decision denying the claim." Id.

"Congress' apparent intent in mandating these internal claims procedures was to minimize the number of frivolous ERISA lawsuits; promote the consistent treatment of benefit claims; provide a nonadversarial dispute resolution process; and decrease the cost and time of claims settlement."  Id.

The court addresses each of Wilson's arguments in turn.

**A.  Exhaustion**

**1.  UHIC Final Denial Letter**

Wilson contends that the language of the UHIC final denial letter demonstrates that all administrative remedies were fully exhausted for all dates of services.  ECF No. 37 at 2.  Because the UHIC final denial letter states that the dates of insurance coverage denied were from "12/1/2015 forward," and concluded with "This is your Final Adverse Determination," Wilson argues that the UHIC final denial letter was a denial of all claims for all dates of J.W.'s residential treatment at CALO.  Id. (quoting ECF No. 35-16 at 2–3 (emphasis in original)).  This is an out-of-context interpretation of the UHIC final denial letter.

In context, the phrase "12/1/2015 forward," clearly stands for December 1, 2015 through April 15, 2016, the dates of the First DOS.  Dr. Beach's only reviewed the denial of insurance coverage after CALO, on behalf of Wilson, filed an Expedited Appeal for the denial of insurance coverage for J.W.'s treatment at CALO during the First DOS. ECF No. 35-13.  The Expedited Appeal was based on Dr. Mayer's opinion and denial stated in the revised UHIC initial denial letter.  ECF No. 35-12 at 104–05.  Both the UHIC initial denial letter and the revised UHIC initial denial letter clearly state that the denial of insurance coverage was for J.W.'s treatment at CALO during the First DOS.  Id.

The court finds the only reasonable to interpretation of the phrase "12/1/2015 forward," as covering the dates in the First DOS.

Additionally, Wilson's interpretation of the phrase "Final Adverse Determination" is out-of-context.  In context, the phrase "Final Adverse Determination" is a defined term in the Plan that informs beneficiaries when the timeframe for filing an external appeal begins.  ECF No. 35-4 at 88.  CALO's filing an external appeal, on behalf of Wilson, of Dr. Beach's decision for the denial of insurance coverage for J.W.'s treatment at CALO during the First DOS after receiving the UHIC denial letter reveals to the court that Wilson recognized the correct meaning of the phrase "Final Adverse Determination" at the time it was received.  ECF No. 35-14.  In short, the court finds that Wilson's interpretation of the UHIC final denial letter is out-of-context and incorrect.  As such, the UHIC final denial letter does not evince that Wilson fully exhausted his administrative remedies.

### 2.   First Letter to UHIC and Second Letter to UHIC

Wilson's next argument is that UHIC's failure to respond to either the First Letter to UHIC or the Second Letter to UHIC proves that Wilson exhausted his administrative remedies.  ECF No. 37 at 4–8.  Wilson contends that both the First Letter to UHIC and the Second Letter to UHIC were appeals, and by not responding to either, UHIC was in violation of 29 C.F.R. § 2560.503-1(l)(1).  Id. at 8.  Wilson contends that because UHIC violated § 2560.503-1(l)(1), he was no longer obligated to exhaust his administrative remedies.  Id.  In response, UHIC contends that neither the First Letter to UHIC or the Second Letter to UHIC were formal appeals, and that UHIC was not required to respond to either letter.  ECF No. 32 at 27.

The section of the Code of Federal Regulation that allows for exhaustion for failure to follow claims procedures states:

> [I]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29 C.F.R. § 2560.503-1(l)(1).  The crux of Wilson's argument is that UHIC violated § 2560.503-1(l)(1) by not responding to the First Letter to UHIC or the Second Letter to UHIC.  In order to determine whether UHIC violated § 2560.503-1(l)(1), the court must determine if the claims procedures established in the Plan required UHIC to respond to the First Letter to UHIC or the Second Letter to UHIC.  In order for the court to make that determination, the court must first determine the nature of Wilson's counsel's requests in the First Letter to UHIC and the Second Letter to UHIC.  The court finds that First Letter to UHIC the Plan was a request for a review, and not an appeal.

The Plan distinguishes between an appeal and a review.  Compare ECF No. 35-4 at 85 with ECF No. 35-4 at 87.  In the First Letter to UHIC, Wilson's counsel indicates that she will be representing Wilson "in connection with the appeal of [UHIC's] denial," but then clearly asks for a review of the denial of claims and not an appeal.  ECF No. 35-33 at 3 ("I wish to notify you that we do wish a review of the denial . . .") (emphasis added).  The language is in concert with the Plan, because a review of the denial is allowed prior to the appeal.  Additionally, the Plan requires that any appeal contain the reason believed as to why the claim should be paid and any documentation or other written information to supporting the request for claim payment.  ECF No. 35-4 at 140–41.  The First Letter to UHIC did not include that information.  ECF No. 35-33.

24

Although the Second Letter to UHIC says that the First Letter to UHIC was an appeal, it was not. The court finds that the First Letter to UHIC is a request for a review, and not an appeal, and that the Second Letter to UHIC is a request for a response to that review, and not an appeal, based on the language of the Plan. Therefore, the court must determine if UHIC's failure to respond to the First Letter to UHIC and the Second Letter to UHIC violated the established procedure in the Plan for a review of a denial of coverage. The court finds that UHIC did not violate the established procedure in the Plan for a review of a denial of coverage.

Because the claims referenced in both the First Letter to UHIC and the Second Letter to UHIC were of previously denied claims, the review of those claims would be considered a Retrospective Review. ECF No. 35-4 at 85–86. The Plan gives a specific timeframe by which UHIC will make a determination of its Retrospective Review. Id. However, the Plan states that UHIC's "failure to make a Utilization Review determination within the applicable time frames set forth above will be deemed an adverse determination subject to an internal Appeal." Id. at 86. As established by the Plan, UHIC was under no obligation to respond to either the First Letter to UHIC or the Second Letter to UHIC.[5] Because UHIC followed the established procedures for a review in the Plan, the court finds UHIC did not violate § 2560.503-1(l)(1) and provided

---

[5] UHIC also argues that it did not respond to the First Letter to UHIC and the Second Letter to UHIC because Wilson's counsel failed to include the proper HIPPA complaint authorization form to allow UHIC to release certain documents to Wilson's attorney. ECF No. 32 at 12. Wilson contends that the First Letter to UHIC did include a HIIPA compliant release form, and if it was the incorrect form, that industry practice dictates that UHIC should have sent Wilson's attorney the proper form. ECF No. 37 at 7. Because the court finds that UHIC was under no obligation to respond to the First Letter to UHIC or the Second Letter to UHIC, the court need not address this argument in this subsection. However, the court will discuss this in further detail in Section III.B.2.

Wilson with a "full and fair review" as required by ERISA. In order to exhaust the administrative remedies, Wilson's attorney should have accepted UHIC's failure to respond as an adverse determination and continued with the appeal process as outlined in the Plan. However, she did not. As such, Wilson did not exhaust his administrative remedies for the Second DOS and Third DOS.

Having found Wilson failed to fully exhaust his administrative remedies for the Second DOS and the Third DOS, the court turns to Wilson's contention that exhaustion should be excused in this instance because of futility.

### B. Futility

Wilson contends that exhaustion of administrative remedies for the Second DOS and Third DOS should be excused based on a futility exception. ECF No. 37 at 2–8. Wilson argues that the wording of the UHIC's final denial letter combined with UHIC's failure to respond to either the First Letter to UHIC or the Second Letter to UHIC proves that attempting to exhaust his administrative remedies would have been futile. Id. UHIC argues that because Wilson failed to raise the argument of futility until the joint stipulation, the court should find that Wilson waived any futility argument. ECF No. 38 at 2. If the court finds that Wilson did not waive his futility argument, UHIC contends that because neither the First Letter to UHIC or the Second Letter were formal appeals, UHIC's lack of response to either letter was justified, and therefore, Wilson cannot demonstrate futility by clear and positive evidence. ECF No. 32 at 26–27; ECF No. 38 at 2–3.

There are two exceptions to the exhaustion requirement recognized within the Fourth Circuit.  Rogers v. Unitedhealth Grp., Inc., 144 F. Supp. 3d 792, 801 (D.S.C. 2015).

> First, if it appears that it would be futile for a plaintiff to have pressed his claim through the plan's established remedies, then a failure to exhaust may be excused.  Dameron v. Sinai Hospital of Baltimore, 626 F.Supp. 1012, 1015 (D.Md. 1986), aff'd in relevant part, 815 F.2d 975 (4th Cir. 1987). Second, if it appears that the plaintiffs would have been denied "meaningful access" to established internal procedures, then, again, a failure to exhaust may be excused.  Watson v. Fuller Brush Co., 570 F.Supp. 1299 (W.D. Mich. 1983); Makar, 872 F.2d at 83.

Id.  "The question of whether exhaustion of administrative remedies is required in a particular ERISA case is a matter within the discretion of the trial court."  George v. Duke Energy Ret. Cash Balance Plan, 560 F. Supp. 2d 444, 469 (D.S.C. 2008) (citing Vogel v. Indep. Fed. Sav. Bank, 728 F. Supp. 1210, 1223 (D. Md. 1990)).  The court begins by examining if Wilson has waived his futility argument.

### 1.    Waiver of Futility

UHIC argues that by not addressing futility until the joint stipulation stage, Wilson waived a futility argument.  **"**Failure to exhaust administrative remedies under ERISA is an affirmative defense.**"**  Rogers, 144 F. Supp. 3d at 802 (citing Taylor v. Oak Forest Health & Rehab., LLC, 2013 WL 4505386, *3 (M.D.N.C. Aug. 22, 2013)). "[T]he burden of establishing the affirmative defense rests on the defendant," and therefore, a plaintiff need not address affirmative defenses in a pleading.  Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (en banc); see also West v. Cont'l Auto., Inc., 2016 WL 6543128, *1 (W.D.N.C. Nov. 2, 2016) ("ERISA plaintiffs are not obligated to plead exhaustion or futility because failure to exhaust is an affirmative defense that must be pled and proven by the defendant.").  As such, addressing futility in

27

the joint stipulation is the appropriate stage of litigation for Wilson to raise that issue.

There are "relatively rare circumstances where facts sufficient to rule on an affirmative

defense are alleged in the complaint."  Wright v. Waste Pro USA, Inc., 2019 WL

5896516, at *6 (D.S.C. Nov. 12, 2019) (quoting Goodman, 494 F.3d at 464).  This is not

one of those rare circumstances.  Therefore, the court finds that Wilson did not waive his

futility argument.  As such, the court addresses the substantive argument that a futility

exception to exhaustion applies in this instance.

### 2.    Clear and Positive Evidence

An exception to the exhaustion requirement exists when "there is clear and

positive evidence that the [administrative] remedies are futile or useless."  Kunda v. C.R.

Bard., Inc, 671 F.3d 464, 472 (4th Cir. 2011) (quotations omitted).  "The futility

exception . . . is quite restricted, and has been applied only when resort to administrative

remedies is 'clearly useless.'"  Kern v. Verizon Commc'ns, Inc., 381 F.Supp.2d 532, 537

(N.D. W.Va. 2005) (quoting Comm. Workers of Am. v. AT & T, 40 F.3d 426, 433 (D.C.

Cir. 1994)).  Courts require that a plaintiff make a "clear and positive" showing that any

pursuit of administrative remedies would be futile.  Makar, 872 F.2d at 83.

Wilson argues that the totality of UHIC's actions prove by clear and positive

evidence that attempting to exhaust his administrative remedies would have been futile.

ECF No. 37 at 2–8.  First, Wilson argues that UHIC would have denied all future claims

of stay because the UHIC final denial letter states that the dates of insurance coverage

denied were from "12/1/2015 forward," and concluded with "This is your Final Adverse

Determination."  Id. at 2.  As the court discussed in more detail above, this is an out-of-

context interpretation of the UHIC final denial letter, and an in-context interpretation of

28

the language of the UHIC final denial letter demonstrates that the UHIC final denial letter was only confirmation of a denial of benefits for Wilson's Expedited Appeal and the claims in the First DOS. As such, the court does not find that the wording of the UHIC final denial letter is evidence that attempting to exhaust his administrative remedies would have been futile.

Wilson's next argument is that UHIC's failure to respond to either the First Letter to UHIC or the Second Letter to UHIC is clear and positive evidence that attempting to exhaust his administrative remedies would have been futile. ECF No. 37 at 4–8. As discussed in more detail above, UHIC was not under any obligation to respond to either the First Letter to UHIC or the Second Letter to UHIC. However, the First Letter to UHIC also requested a copy of the Plan. ECF No. 35-33. The Plan states that UHIC is under an obligation to provide Wilson with a copy of the Plan upon request. ECF No. 35-4 at 154. UHIC concedes it did not provide Wilson a copy of the Plan. ECF No. 32 at 12. UHIC argues that it did not provide Wilson a copy of the Plan because the request from Wilson's attorney did not contain the requisite HIPAA release forms. Id. The Plan itself is not covered under HIPAA, therefore, the court rejects this argument. As such, the court must determine if UHIC's failure to respond to this document request constitutes clear and positive evidence of futility in this instance. The court finds that it does not.

Other courts have found that a failure to respond to document requests sufficiently establishes futility. See, e.g., Rogers, 144 F. Supp. 3d at 802 (finding that any further attempt to appeal refusal of coverage would have been futile under the circumstances after failing to respond to two requests for documents by the beneficiary); Nessell v.

Crown Life Ins. Co., 92 F. Supp. 2d 523, 529 (E.D. Va. 2000) (holding that any further attempt to appeal would be futile where defendant (1) refused to turn over requested copies of plan documents and medical reports and (2) told plaintiff that its decision was "final and irrevocable" and would not consider any appeals). In each of those cases, the defendant insurance company failed to respond to previous appeal attempts or explicitly told the plaintiff beneficiary that the denial determination was final and no further appeals would be heard.

However, when a plaintiff beneficiary cannot show that the defendant insurance company is unresponsive when the formal appeal process is filed or when the plaintiff beneficiary is specifically informed of his appeal rights, failure to respond to a request for documents does not demonstrate futility. See Day v. Eastman Chem. Co., 2013 WL 5657678, at *3 (D.S.C. Oct. 15, 2013) (concluding that an appeal by plaintiff would not have been futile when he was informed of his appeal rights, and had formally gone through the appeal process previously, notwithstanding that the defendant insurance failed to respond to an email); Gruber v. Unum Life Ins. Co. of Am., 195 F. Supp. 2d 711, 717 (D. Md. 2002) ("Plaintiff has shown that her earlier informal attempts to change her classification had been unsuccessful and probably frustrating, but has offered no evidence that a formal review process would not have yielded a different result."). Here, UHIC did respond to previous appeal attempts, as proved by the UHIC initial denial letter, the UHIC final denial letter, and the External independent denial letter. Additionally, UHIC never indicated that its denial determination was final and no further appeals would be heard. To the contrary, each denial of claims in the Second DOS and Third DOS included the options available for Wilson to appeal or dispute the denial

determination.  ECF Nos. 35-19–35-22.  Because UHIC demonstrated that it did respond to appeals made following the procedures set forward in the Plan, provided Wilson with the process for making an appeal with each claim denial, and never indicated that the denial of claims was final or not subject to appeal, failure to provide the Plan document does not demonstrate futility by clear and positive evidence.  Therefore, the court finds that futility does not apply and Wilson failed to exhaust his administrative remedies for the denial of claims for the Second DOS and the Third DOS.  Because exhaustion of administrative remedies "is an essential prerequisite to judicial review of an ERISA claim for denial of benefits," Gayle, 401 F.3d at 230, and since this is impossible here, Wilson's claims for the Second DOS and Third DOS are barred and dismissed with prejudice.[6]

### C.  Denial of Claims

Having found that Wilson failed to meet the requirement for exhaustion of his administrative remedies for the denial of claims for the Second DOS and the Third DOS, the court now addresses whether UHIC's decision denying coverage of J.W.'s inpatient treatment at CALO from the First DOS was appropriate.  When a plan "confers discretion on a fiduciary and the fiduciary acts within the scope of conferred discretion, [courts] defer to the fiduciary in accordance with well-settled principles of trust law."  Booth, 201

---

[6]  The opportunity for Wilson to pursue his administrative remedies has expired pursuant to the language of the Plan.  ECF No. 35-4 at 86 ("You have up to 180 calendar days after You receive notice of the adverse determination to file an Appeal.").  When a beneficiary to a plan is time-barred from pursuit of administrative remedies for denied benefits and has failed to exhaust those administrative remedies for those benefit, "dismissal with prejudice is required" for all claims related to denial of those benefits.  Gayle, 401 F.3d at 230.

F.3d at 341 (citing <u>Firestone</u>, 489 U.S. at 111).  Here, UHIC clearly serves as the

fiduciary for the Plan:

> The Plan Administrator and other Plan fiduciaries shall have discretionary
> authority to interpret the terms of the Plan and to determine eligibility for
> benefits in accordance with the terms of the Plan.  Any interpretation or
> determination made pursuant to such discretionary authority shall be given
> deference and be legally binding on all parties and subject to review by a
> legal authority only to the extent the decision was arbitrary and capricious.

ECF No. 33 at 2.[7]  Additionally, both parties stipulate that the proper standard of review

is abuse of discretion.[8]  <u>Id.</u>  As such, the court will analyze UHIC's decision denying

coverage of J.W.'s inpatient treatment at CALO from December 1, 2015 through July 31,

2017 utilizing an abuse of discretion standard.

     As discussed above, the Fourth Circuit has found that a plan administrator's

decision should be undisturbed and found reasonable if it is "the result of a deliberate,

principled reasoning process and if it is supported by substantial evidence."  <u>Brogan v.

Holland</u>, 105 F.3d 158, 161 (4th Cir. 1997).  The court applies the <u>Booth</u> factors to

determine if UHIC's decision was reasonable.  201 F.3d at 342–43.  In doing so, the court

reviews the administrative record to decide if UHIC's decision was the product of a

principled, reasoned decision-making process supported by substantial evidence.

---

[7]  In the joint stipulation, the parties stipulate to the language above being present in the
Plan.  The court's review confirms this language is present in the Plan in the 2015 Plan,
2016 Plan, and 2017 Plan.  ECF No. 35-3 at 156; ECF No 35-4 at 156; ECF No. 35-5 at
158.

[8]  In his response brief, Wilson argues that the standard of review should be <u>de novo</u> if
the court finds that UHIC did not provide Wilson a "full and fair review" by failing to
respond to the First Letter to UHIC or the Second Letter to UHIC.  ECF No. 37 at 9.
Having found that UHIC did provide Wilson a "full and fair review" despite not
responding to the First Letter to UHIC or the Second Letter to UHIC, the court proceeds
with an abuse of discretion analysis, as required under Fourth Circuit precedent, <u>Booth</u>,
201 F.3d at 341, and agreed upon in the parties' joint stipulation, ECF No. 33 at 2.

Williams, 609 F.3d at 622.  However, the court does not weigh the evidence in the administrative record because that is outside the scope of the court's review under the abuse of discretion standard.  Id.

### 1. First Booth Factor: The Language of the Plan

The first Booth factor weighs in favor of a finding that UHIC did not abuse its discretion.  As the court detailed above, both parties jointly stipulated to the Plan granting UHIC the "full discretionary authority to interpret the terms of the Plan and to determine eligibility for benefits in accordance with the terms of the Plan.  ."  ECF No. 33 at 2.  As detailed above in the UHIC initial denial letter, the UHIC final denial letter, and the External independent denial letter, UHIC followed the procedures for administering and interpreting eligibility for benefits in accordance with the terms of the Plan.  As such, the court finds that the language of the Plan weighs in favor of a finding that UHIC did not abuse its discretion in denying of coverage for claims from the First DOS.

### 2. Third Booth Factor: The Adequacy of the Materials Considered to Make the Decision, and the Degree to Which They Support its Decision

Wilson, relying on Wit v. United Behavioral Health, 2019 WL 1033730 (N.D. Cal. 2019), argues the Level of Care Guidelines are inadequate and resulted in UHIC abusing its discretion by denying coverage for J.W.'s residential treatment at CALO during the First DOS.  ECF No. 31 at 23–26.  Wilson contends that based on the findings of fact and conclusions of law in Wit, the Level of Care Guidelines fail to address the impact of being a minor child on the medical necessity of treatment, fail to consider J.W.'s underlying psychiatric condition, and fail to contemplate if treatment at a lower level of care could be accomplished safely and effectively.  Id.  Wilson asserts that these

failures resulted in an arbitrary and capricious decision in denying the claims during the First DOS.  Id.  UHIC argues that the court should not consider the statements of fact or the conclusions of law in Wit because the decision is a non-binding, non-final order and because it would allow for the consideration of facts not in the administrative record. The court agrees with UHIC.

On March 5, 2019, Chief Magistrate Judge Joseph Spero entered findings of fact and conclusions of law, ruling that the claims administrator is liable to the class under ERISA for abusing its discretion in the denial of benefits and for breach of fiduciary duty. See Wit, 2019 WL 1033730, at *51–55.  However, there has been no final ruling on the merits in that case.  The Wit court is currently presiding over motions regarding potential class decertification and appropriate remedies.  See David P. v. United Healthcare Ins. Co., 2020 WL 607620, at *8 (D. Utah Feb. 7, 2020) (detailing the stage of litigation of the Wit case).  At the state of litigation which Wit is currently in, it is inappropriate for the court to apply non-final orders such as Wit to the facts here.

Furthermore, the court's consideration of Wit is impermissible under Helton v. AT & T Inc. 709 F.3d 343, 356 (4th Cir. 2013).  In Helton, the Fourth Circuit made clear when it was permissible for a district court to consider evidence outside the administrative record on an abuse of discretion review in an ERISA case.  Id. at 356.  The Helton court held, "a district court may consider evidence outside of the administrative record on abuse of discretion review in an ERISA case when such evidence is necessary to adequately assess the Booth factors and the evidence was known to the plan administrator when it rendered its benefits determination."  Id.  As discussed above, the Wit decision was delivered on March 5, 2019.  Therefore, it would have been impossible

34

for UHIC to have known of this case for decisions it made in 2015 and 2016 during the First DOS. As such, the court will not consider <u>Wit</u> in its abuse of discretion review.

After reviewing the administrative record, the court finds that the material Dr. Mayer and Dr. Beach analyzed to reach their decision to was adequate. This material included J.W.'s treatment history, J.W.'s treatment while at CALO, his underlying medical conditions, his family involvement, drugs prescribed to J.W., conversations with J.W.'s psychiatrist at CALO, and his complete medical history. After reviewing that material, Dr. Mayer and Dr. Beach rendered their decisions to deny coverage for J.W. based on the Plan and the Level of Care Guidelines. The purposes and goals of the Plan include providing mental health benefits that are medically necessary. Based on the administrative record, the Plan, and the Level of Care Guidelines, Dr. Mayer and Dr. Beach found that residential treatment was inappropriate for an adolescent with J.W.'s symptoms and underlying conditions. ECF No. 35-12 at 98–99; <u>see also</u> ECF No. 35-16 at 2–3 ("The non-coverage determination for Residential level of care will be upheld on 12/01/2015 forward. This is based on UBH Level of Care Guidelines for Residential Treatment of Mental Health Disorders. Your son had been at this facility for four months by 12/01/2015. His behaviors had improved. He appeared to be able to continue his care at a day program."). This determination was confirmed to be appropriate by an independent, external reviewer. ECF No. 35-17 at 6 ("Nothing in the documentation reviewed indicates that this patient required or could benefit from 24-hour daily confinement, observation, and treatment. On the contrary, a more appropriate treatment plan would have included intensive outpatient treatment with a very strong family therapy component while the patient lived in his community with his family.").

As such, the court finds that the materials considered by UHIC to make its decision to deny coverage for J.W.'s treatment at CALO during the First DOS was adequate and supported the decision to a high degree.  Therefore, the court finds that the third Booth factor weighs in favor of UHIC not abusing its discretion in the denial of coverage for claims from the First DOS.

### 3.  Fifth Booth Factor: Whether the Decision-Making Process was Reasoned and Principled

Wilson argues that UHIC's decision-making process was not reasoned or principled for two reasons.  First, Wilson contends that UHIC "cherry picked" evidence that would support a finding that J.W.'s treatment at CALO was medically unnecessary, and that by ignoring evidence that would have resulted in a medically necessary determination, UHIC was not reasoned or principled in its decision-making process.  ECF No. 32 at 14–17.  This contention is unfounded.  J.W.'s medical records show that he did exhibit isolated incidents that required emergency safety physical interventions during the First DOS, but taken in its entirety the administrative record shows that UHIC's decision for a denial of coverage was supported by substantial evidence.  ECF No. 31-1 at 1–10.  As such, the court rejects this argument.

Relying on Wiwel v. IBM Medical and Dental Benefit Plan for Regular Full-time and Part-time Employees, 2018 WL 526988 (E.D.N.C. 2018), Wilson also asserts that UHIC's failure to consider whether J.W.'s condition may have improved simply by virtue of his being treated in a residential setting shows that its decision-making process was neither reasoned or principled.  ECF No. 32 at 18–21.  Wilson's reliance on Wiwel is misplaced.  In Wiwel, the court found that the defendant abused its discretion by failing to consider if the residential treatment itself was the contributing factor in the plaintiff's

36

improved circumstance.  2018 WL 526988 at *7.  The court made this decision on two

factors: (1) that plaintiff refrained from self-cutting because she did not want to suffer the

consequences of those actions imposed at the residential treatment facility; and (2) the

reviewer offered no reasons to conclude that removing plaintiff from the residential

treatment facility would not lead to a return of plaintiff's self-harming behaviors.  Id. at

*4–*5.

      The facts in this case are distinguishable from Wivel.  First, there is no record of

either J.W. self-reporting or medical care workers at CALO reporting that J.W.'s

behaviors changed because of consequences at CALO.  In fact, the External independent

denial letter indicates that J.W.'s behavior at CALO during the First DOS "was

essentially uneventful."  ECF No. 35-17 at 6.  The court's review the medical records in

the administrative record found that the External independent denial letter's

determination was supported by substantial evidence.  ECF No. 31-1 at 1–10.  Next, both

the UHIC initial denial letter and the UHIC final denial letter offered reasons to conclude

why removing J.W. from CALO would be beneficial to his treatment.  See ECF No. 35-

12 at 98–99 ("Your child was admitted for residential treatment of his mood problems.

Your child did not need the 24-hour monitoring provided in a residential setting, and . . .

care could have continued in the intensive outpatient setting with individual

psychotherapy, family therapy and medication management."); see also ECF No. 35-16 at

2–3 ("The non-coverage determination for Residential level of care will be upheld on

12/01/2015 forward.  This is based on UBH Level of Care Guidelines for Residential

Treatment of Mental Health Disorders.  Your son had been at this facility for four months

by 12/01/2015.  His behaviors had improved.  He appeared to be able to continue his care

at a day program.").  As the court noted above, this determination was confirmed by an

independent, external reviewer.  ECF No. 35-17 at 6 ("Nothing in the documentation

reviewed indicates that this patient required or could benefit from 24-hour daily

confinement, observation, and treatment.  On the contrary, a more appropriate treatment

plan would have included intensive outpatient treatment with a very strong family

therapy component while the patient lived in his community with his family.").  As such,

Wilson's reliance on <u>Wiwel</u> is without merit.

        The court finds that UHIC followed the policies and procedures pursuant to the

Plan during reviews that led to the UHIC initial denial letter, the UHIC final denial letter,

and the External independent denial letter.  As such, the court finds that UHIC's decision-

making process was reasoned or principled, and therefore, the fifth <u>Booth</u> factor weighs

in favor of a finding that UHIC did not abuse its discretion in denying coverage for

claims from the First DOS.

### 4.  Sixth <u>Booth</u> Factor: Whether the Decision was Consistent with the Procedural and Substantive Requirements of ERISA

        As detailed above, each of the denials of coverage for claims from the First DOS,

the UHIC initial denial letter, the revised UHIC initial denial letter, the UHIC final denial

letter, and the External independent denial letter were completed within the time frames

set by ERISA, that Wilson was notified of the findings, and included the options

available for Wilson to appeal or dispute the determination.  Additionally, Wilson does

not dispute that UHIC met all procedural and substantive requirements of ERISA during

its review of coverage for claims during the First DOS.  As such, the court finds that

UHIC met all procedural and substantive requirements of ERISA during its review of

coverage for claims during the First DOS.  Therefore, the sixth <u>Booth</u> factor weighs in

38

favor of a finding that UHIC did not abuse its discretion in denying coverage for claims from the First DOS.

### 5.  Seventh <u>Booth</u> Factor: The Existence of Any External Standard Relevant to the Exercise of Discretion

Pursuant to the New York State Public Health Law, Article 49, the state of New York allows for an external review of any denial of benefits by an insurance plan.  As detailed above, the External independent denial letter found that UHIC was correct in finding that J.W.'s treatment was not medically necessary, that the denial of coverage for the claims during the First DOS was appropriate, and that UHIC did not abuse its discretion.  ECF No. 35-17 at 6.  UHIC met the external standard set forth by the state of New York.  Additionally, Wilson does not dispute that UHIC complied with the external standard set forth by the state of New York its review of coverage for claims during the First DOS.  As such, the court finds that the seventh <u>Booth</u> factor weighs in favor of a finding that UHIC did not abuse its discretion in denying coverage for claims from the First DOS.

### 6.  Eighth <u>Booth</u> factor: The Fiduciary's Motives and Any Conflict of Interest It Might Have

Wilson makes no argument that there was any conflict of interest in UHIC's denial of coverage determination.  Even if there were a conflict of interest, the External independent denial letter determination that UHIC was correct in finding that J.W.'s treatment was not medically necessary, that denial of coverage for the claims during the First DOS was appropriate, and that UHIC did not abuse its discretion would overcome such conflict.  <u>See</u> <u>Lance v. Ret. Plan of Int'l Paper Co.</u>, 331 F. App'x 251, 255 (4th Cir. 2009) (holding that when an ERISA plan is structured for an independent review, any

potential conflict "may be deemed of such little importance as to recede 'to the vanishing point.'") (quoting Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008). The Plan did have such an independent review structure. As such, the court finds that the eighth Booth factor weighs in favor of a finding that UHIC did not abuse its discretion in denying coverage for claims from the First DOS.

In sum, the Booth factors weigh in favor of a finding that UHIC did not abuse its discretion. As such, the court finds that UHIC's denial of coverage of claims during the First DOS was the result of a deliberate, principled reasoning process and supported by substantial evidence. Therefore, the court finds that UHIC did not abuse its discretion by denying coverage of claims during the First DOS, and finds for judgment in favor of UHIC.

### D. Attorney's Fees

Wilson argues that the court should direct UHIC to compensate him for attorney's fees. ECF No. 31 at 1. In an ERISA action, the court has discretionary authority to "award reasonable attorneys' fees to either party under 29 U.S.C. § 1132(g)(1)." Rinaldi v. CCX, Inc., 388 Fed. App'x. 290, 297 (4th Cir. 2010). "The purpose of ERISA's fee shifting provision, like other fee shifting statutes, is to encourage the bringing of meritorious . . . claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel." Feldman's Med. Ctr. Pharmacy, Inc. v. CareFirst, Inc., 898 F. Supp. 2d 883, 896 (D. Md. 2012), aff'd, 541 F. App'x 322 (4th Cir. 2013) (internal quotation marks and citations omitted). A motion for attorney's fees under § 1132(g)(1) requires the court to perform a two-step analysis. Williams, 609 F.3d at 634–35.

In the first step, the court must determine whether the moving party achieved "some degree of success on the merits," as required by Hardt v. Reliance Std. Life Ins. Co., 560 U.S. 242 (2010). The rule in the Fourth Circuit prior to Hardt was that only a "prevailing party" was eligible for an award of attorney's fees in an ERISA action. Williams, 609 F.3d at 634. The Supreme Court in Hardt denounced the "prevailing party" standard and adopted the "some success on the merits" standard for a moving party to qualify for fees under § 1132(g)(1). 560 U.S. at 255. The Hardt court held that this standard can be met "if the court can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquir[y] into the question [of] whether a particular party's success was substantial or occurred on a central issue." Id. However, the "some success on the merits" standard is not met if the moving party can only show "trivial success on the merits" or a "purely procedural victor[y]." Id.

As discussed in detail above, Wilson cannot make a showing of some success on the merits for his ERISA claim. Therefore, the court declines to award Wilson attorney's fees.

## IV.  CONCLUSION

For the foregoing reasons, the court **GRANTS** judgment in favor of UHIC.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 1, 2020**
**Charleston, South Carolina**